May I please the court? Good morning. Let us simply ask ourselves, is it exceptional and extremely unusual hardship for an 87-year-old mother in frail health to lose her only daughter in the U.S.? By deporting Ms. Pahutan to the Philippines, mother will never ever see her again. Pahutan can never feasibly return to the U.S. because she'll never be granted a visa and mom cannot travel to see her. That is exactly the situation Mr. Walter Pinera, with a national reputation for unscrupulous attorney that preys on immigrants seeking green cards, got Ms. Pahutan in. Thankfully, the State Bar forced Mr. Pinera to resign with disbarment charges pending and for that were seeking judicial notice. The BIA found that our motion to reopen based on ineffective assistance of counsel is meritless and that Mr. Pinera's performance was not so inadequate that it prejudiced the outcome of the proceeding and characterized Mr. Pinera's and Zasa's inaction as tactical decisions which did not rise to the level of ineffective assistance of counsel. Out of the 689 pages presented, Mr. Pinera, on the helm for 8 years, presented one, just one page of crucial evidence regarding the medical condition of the mom. And to boot it, that one page was 2 years old when the judge reviewed it. So let me, the lawyer who showed up at the hearing, what was his name?  Zaslow, right. Mr. Zaslow responded to the letter of complaint against him at the State Bar. He did, Your Honor. Right. And he says, well, I met with her beforehand and I told her we were going to need some medical documentation. I think that's what he said, something to that effect. If I may grab it, Your Honor. Sure. So what do we do with that? The question, Your Honor, is who actually represented Ms. Pahotan? She hired Mr. Pinera. Mr. Zaslow had just been accepted to the Bar in December 2002, a mere 1 year and 2 months after he shows up for the individual hearing. We have three declarations, sworn declarations, that stated he only met with me a week before. Ms. Pahotan says he met with me a week before. To my surprise, I never met him before. And another two declarations from the mom and the brother who stated we never talked to him. Yes, we saw him at the court. We were there ready to testify, but we never talked to him before, specifically  He's an associate with Ms. Pahotan. He's an associate, yes. And recall, Your Honors, that the State Bar specifically cited Mr. Pinera for this lack of supervision of associates. That's one of the reasons he got he resigned with charges pending. That is the main crux of why of the State Bar complaint against him, which we're asking judicial notice for, is that he failed to supervise associates. Now, in your brief to the board, the board, the Board of Immigration Appeals, you make note of some local rules at the immigration court level about filing evidentiary matters. At the time of this case, when were the Petitioners or when were the parties required to file with the court their documentary evidence? I appreciate the question, Judge Paz. The hearing took place on February 24th, 2004, so you 15 days before that would have been February 11th or so, or 10th. To their credit, Your Honor, Mr. Pinera filed something on that date. There are some filing on February 10th, 2004, which predates the 15 days. Perfect. But what's in them? Really nothing substantial. What was in them? There was in them something about the son medical condition or he's having – I reviewed them, there are checks paid to Kaiser, there are bank statements, tax returns for Ms. Pajotan. The bottom line is, Mr. Pinera was one trick pony. He just knew how to do the old law, the suspension of deportation, where it relied on the extreme hardship of the appellant, Petitioner. In this new law, under IHRA-IHRA, we have the cancellation of removal, which specifically says to look for the extraordinary and unusual hardship to qualify relatives, which would be the mom in this case. So all these filing, that's why I said out of all these 600 pages or so, there's one page only that deals with the crux of this matter, that is the health of the mom. That's the failure. One other issue that the, I think it was the IJ that raised this issue, was that the mom had been living with the son for a number of years, and the son had actually, had supported her petition when she came over. He agreed to support her. Fair enough. Your Honor, this is a – The IJ pointed to that, to say that it just wasn't the daughter who was responsible. The affidavit of support can only be accepted by a U.S. citizen or a green card holder. This is probably what you're referring to. So when somebody petitions a mom, first of all, the son was the only U.S. citizen who could actually legally petition, that's number one. Second, the affidavit of support that I believe you're mentioning, Judge Pice, is only accepted by someone who has legal status in the U.S. So even if Ms. Powhatan wanted to support her mom, she could not have legally provided any, at least for the immigration service. And remember, we're dealing with two issues. One is the procedural issue to get a green card through immigration process, and the other is the moral and daily support and care for the mom. Those are two completely different issues we submit. And on the latter issue, she's been living with – the mother's been living with the daughter now for at least two years, correct? Your Honor, the mother is still alive. She's frail, and she still has – goes and comes back, from what I know, to the – to the daughter and to the son. Oh, I misunderstood. Well, I understood that – from what I understood in the paperwork now was that the petitioner, her employer has built out a room to accommodate both petitioner and the mother, and there's pictures of that in the record that were produced in support of the motion to reopen, and that the mother was now living with the daughter. Yes. This obviously calls for new evidence, and I'm happy to shed some light on this. From my understanding – I'm only doing this – all I'm saying is what I read in the – Yes. In the motion to reopen. It's completely so. The motion to reopen was based – actually, it was raised twice. Mr. Pinata did raise it before in his motion to reopen. Yes. Now, the house, the addition has been done. The house is ready. The place is – and Ms. Powhatan continues to be ready to take care of her mom. But there's an issue here. She's 87 years old, and the son says to his sister, if you're not legally here, and you're not going to be permanently available for us, I'm not about to put mom through this – sending her there so you have your argument in court and come back and say, oh, I lost, and mom has to come back. She just cannot take that kind of change. So you're correcting the statement made in the brief, correct? At the time, recall, this is a different story. If you're asking me about today or then, at that time, those statements are correct that she had the intention. She actually came here, from what I understand, and had been here with Ms. Powhatan. I had gotten the impression that she'd actually – had begun to live in the room with Ms. Powhatan. Yeah. She did begin to live. At this moment, she's not there. You know, the problem I have is, even assuming that there was incompetence of counsel, I have difficulty with the prejudice aspect, because the mother had been living with her son for 10 years. During that time, I think there were very few times that she came over, if any, to live with the daughter. Now, if she could live with the son for 10 years and the daughter wasn't really seeing her, it seems to me that this looks like it was kind of fashioned in order to give the daughter a good claim. And I don't think it gives a very good claim. Judge Hugg, if I may, Ms. Powhatan visited her mom once a month, even when she was in L.A. She talked to her once a day on the phone, and the mom knew that daughter is available to her at any time. That's got to account for something we submit. Well, it would be – I don't want to tell you how to argue your case, but if the contention were that the mom's condition has deteriorated so much that she needs constant supervision, and the only person who can really give her that constant supervision is the daughter, then you have a pretty compelling case. But it doesn't sound like that's what you're saying. What I'm saying is we're waiting for the time. Mom has been here. She has visited. She has stayed with her. But on a permanent basis, we're waiting for the time where she could have that peace of mind that her daughter is here to stay. But that's not the standard for cancellation of removal. It's – it was exceptionally – Exceptional. Extreme hardship. Extremely unusual, yes. To the citizen mom – or to the resident – permanent resident mother. Other than advanced age, what issues does mom have, and what about the cultural issue that was raised in the brief that traditionally the mother is cared for by the daughter? I appreciate the question. The issue is they are from the Philippines, and under that culture, and really many cultures to that effect, it's daughter who takes care of the mom. And being the only daughter in the U.S., that's really where mom wants to be. Now, she has medical issue. How about the fact that she wasn't there for 10 years under that culture? That she was with the son for 10 years? The – there is an element of psychological issue, and which we'd love to have her tested when we go back to the immigration judge, is that peace of mind, that elderly feeling that, look, I have my daughter that's going to take care of me. That's what we submit means a lot to grandma. Does mom have any family in – or not mom? Mom will be here with the son. Okay, that's fine. I get the question. You talked about the medical issues, Your Honor. And then we cited them in our brief on page 20. The lack of – we cited eight different medications that mom is taking daily. Thank you. And – We should hear from the government. We've been – Thank you. Let you go over your time. Good morning. May it please the Court. I'm Paul Fiorina for the Respondent. Judge Pius and Judge Hugg, you – your questioning touched on the core issue of this case, and it's whether there was any prejudice from the representation of Ms. Pahoutan at her immigration hearing. And – Well, Mr. Pineda has a – has a sterling reputation in our court. I understand that, Your Honor. But Mr. Pineda did not represent – That was part of the problem, is he would – he would take on representation of many immigrants, and then he would just foist them off onto his associates, who he never really supervised. And that's well documented in his – in the records before the California State Bar. Okay. That's true. Let's take a look at this case. What happened here? Mr. Zaslow made an offer of proof as the testimony of the son and the petitioner's, I think, mother, as to what she would say. And what came out in his offer of proof – and this is in the record that – I can't remember the exact page number. But what he said is that we're going to – the mother's going to testify that she's old and she's sick and she wants to have her daughter take care of her. Right. And the son would testify that mom is old and sick and she's got diabetes, hypertension, and I need to take care of her. And then in their motion to reopen with the board, when they brought up the alleged ineffective assistance of counsel, they made another offer of proof. This is the form of affidavits by both the son and the mother. And the testimony that they would have given is exactly the same as what's in the offer of proof. In other words, there's no – Well, that was pretty – you kind of knew what they were going to testify to. What was critical here, though, was what was the medical condition of the mother. Yes. Because the test, as counsel was just saying, is extreme and unusual hardship to an eligible person. Here, a resident alien, the mother, a qualifying relative. And that was her. So they had to show that the departure of Ms. Bahutin would be an extreme and – cause an extreme and unusual hardship on the mom. Yes. And, you know, pretty much from all my reading of the BIA cases in this area, if it's a medical, you've got to have some medical documentation. One, showing the condition, showing what's needed, the care, and also showing that you can't get similar care in the country at home, you know, the home country. When you have children who are going back. Right. Well, what was submitted to the immigration judge on page 341 of the record is a note from a doctor saying that she has hypertension, hyperthyroidism, mitral regurgitation, aortic insufficiency, diabetic – and so forth. The judge knew. The judge knew that the mom was ill. No, but do you think – so he meets with her 14 – what was it? A week before. According to the best we can tell, it was about a week before the hearing. And tells her, I guess, what's going to take place and what's going to happen. And at some point – I don't know if it was then that he tells her that you need a medical, you need documentation. Now, you know, wouldn't a reasonably competent lawyer ahead of time tell his client, look, you need to show that your mother's condition is of such a nature that she needs constant care by the daughter? That's exactly what Mr. Zaslow did. Where does it show that? It's in his response to the bar complaint. He said that I told her that I needed documentation. When did he do – he doesn't – he's very careful. He doesn't say – he doesn't say at all when he met with her. Okay. In relation to the hearing. I read that very – if you read his – if you read his declaration, he doesn't say when he met with her. But still, he – they haven't shown any prejudice in this case because they haven't shown that there was – They don't have to show actual – I mean, they don't have to show they're going to win. Well, they haven't – they haven't shown that they can – that any additional medical evidence would have affected the outcome of the case. They haven't shown that. I mean, the fact that he may have met with her, you know, shortly before the hearing doesn't matter if they can't show that there was a critical piece of evidence that could have swayed the outcome in this case. The I.J. looked at it. The Board looked at it in a first motion to reopen. This Court looked at it. I think they had some evidence for the Dr. Opine. You know, I'm just saying hypothetically, and I know this is not in the record, but, you know, she's showing serious signs of dementia, forgetful, can't, you know, can't remember where she is, leaves on the gas – well, they do have some statements to this effect that they – she'd turn on the stove and leave it on, forget to turn it off and stuff like that. I mean, you know. If there was medical evidence that was not presented to the I.J. that would have made this case substantially different from what was actually presented to the I.J., they could show prejudice, but they haven't shown it here. They haven't shown prejudice here. They can't show that the case would have been any different. I mean, you look – you compare the offers of proof between what Son would have said or made at the court and what he says to the Board that he would have said in his own words, same comment. Scalia, couldn't a competent lawyer have presented that evidence? No. Sasselo's called in at the last minute. The record's pretty clear on that. He doesn't know this case well. I disagree. I think he did know the case well. If you look at the offer of proof that he made, he knew – There's been findings that he knew the case well enough to suffice. Whether he knew it well to adequately represent his client is the issue, isn't it? Certainly one of the issues, in my mind. Yes. And how do we – how does the reviewing court evaluate that? They take a look at what he actually did in court and compare that with what his client said he should have done. And the comparison we make is between the offer of proof and paper. To me, you can assume that he was incompetent, but I have a hard time seeing what the prejudice there is when for 10 years she's been living with the son, hasn't gone over to live with the daughter hardly at all. And so why couldn't she continue to live with the son? Exactly, Your Honor. That's exactly the point that the immigration judge made. And that's the critical finding that foreclosed the cancellation claim. It was the fact that the departure of Ms. Pahoutan would not deprive her mother of the sole caregiver, which is the standard that the Board uses in making these assessments. Ms. Pahoutan says in the record that her mother's poor health and the fact that her brother and his wife work full time, his family's no longer able to take care of mom. The Board considered that and decided even in spite of that fact, it would not be exceptional and extremely unusual hardship on the mom if she were deported. And that is a discretionary finding that this Court recognized in its prior dismissal of this case. There's no jurisdiction to review that. We're looking at prejudice here. We're looking at prejudice. I guess they can just put the mom in a nursing home, you know. Possibly. And if that's the case, and if the Board would rule that it's not exceptional and extremely unusual hardship, the Court's foreclosed from looking behind that discretionary call. I understand. And so for these reasons, because there's no hardship, I mean, there's no prejudice shown, we'd ask the Court to affirm the Board's decision and deny the petition for review. Thank you. Do you have any rebuttal? One minute. Thank you very much. Nobody says it better than the government trial attorney. On page 262 of the certified records, Your Honor, the government attorney says, we don't have any. We have little evidence of the mother medical conditions. Now, that's the attorney sitting in the courtroom before the judge and weighing the evidence. Thank you so much. Unless there's another question. No, I don't have any other questions. Thank you. Putin versus Holder is submitted.
judges: Watson, Hug, Paez